NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-1753

———

PAULA PAGONAKIS,

Appellant

v.

EXPRESS LLC,
also known as Limited Brands, Inc.

———

Appeal from the Judgment of the District Court
for the District of Delaware
(District Court Civil Action No. 06-027)

———

Argued February 3, 2009

Before: McKEE, STAPLETON, *Circuit Judges*, and IRENAS,[*] *Senior District Judge.*

(Filed : March 5, 2009)

Jason H. Ehrenberg, Esq. (Argued)
Bailey & Ehrenberg PLLC
1155 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
*Counsel for Appellant*

---

[*] The Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

Andrew C. Smith, Esq. (Argued)
David A. Campbell, Esq.
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-0000

Francis G.X. Pileggi, Esq.
Sheldon K. Rennie, Esq.
Fox Rothschild LLP
One Citizens Bank Center, Suite 1300
919 N. Market Street, P.O. Box 2323
Wilmington, DE 19899
*Counsel for Appellee*

OPINION

IRENAS, *Senior United States District Judge.*

Appellant Paula Pagonakis, a former employee of Appellee Express LLC, appeals the District Court's decision granting summary judgment to Express on her employment discrimination and retaliation claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and her retaliation claim under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. Because disputed issues of material fact exist as to whether Pagonakis could perform the essential functions of her position, and whether she suffered an adverse employment action, we will reverse the grant of summary judgment and remand the case as to the ADA discrimination claim. We will affirm the grant of summary judgment on the retaliation claims.

I.

Pagonakis' claims arise out of her employment at the Express clothing store in the Christiana Mall in Newark, Delaware, from June 2000 through March 2004. She began as a part-time salesperson there, after she transferred from another Express store in Ohio, where she was also a part-time salesperson. According to Pagonakis, upon her transfer, she "discussed" her medical conditions[1] with the Christiana Store Manager, Kristyn Bosley (Pagonakis' immediate supervisor), and the District Manager, Ana Klancic, who also had supervisory authority over Pagonakis. (JA 296) Express disputes that Pagonakis told management about her specific impairments. They assert that she only asked for certain accommodations. It is undisputed, however, that Klancic allowed Pagonakis the requested accommodations which were: periodic breaks during a shift to allow Pagonakis to rest; scheduling Pagonakis on daylight shifts only (she cannot drive when it is dark or when it is raining, snowing or foggy); not assigning her to climbing tasks; not scheduling her to work for more than three to four days in a row; and periodically allowing her to work from home to compensate for the times when she could not drive to work due to weather.

---

[1] Several years prior to Pagonakis' employment with Express, she suffered a closed head injury during a car accident. As a result of this injury, she allegedly suffers from "persistent vertigo," and at times becomes disoriented or "lose[s] [] equilibrium" when exposed to bright or moving lights. (JA 294) She also claims to have trouble reading and processing auditory stimuli, and suffers from fibromialgia. Though Express disputes these assertions, they did not move for summary judgment on the issue of Pagonakis' disability, and therefore it may be assumed that Pagonakis is "disabled" under the ADA, *see* 29 C.F.R. § 1630.2(g), for the purposes of this appeal.

In March 2002, Klancic promoted Pagonakis to the full-time, salaried position of Brand Sales Leader, which is described as a "quasi-managerial position." (JA 296) After this promotion, Pagonakis asserts that various "store personnel" began making "off-hand[] comments" "about [her] disabilities and about their view that [she] was not 'management material' because of [her] disabilities." (JA 296) Pagonakis states that she complained to Klancic about the comments, and that Klancic advised Pagonakis to avoid the people making the comments. It is undisputed that Pagonakis' accommodations remained in place after her promotion.

In June 2003, Klancic promoted Pagonakis again; this time to the full-time salaried position of Co-Manager. Pagonakis' accommodations continued. Klancic states that she "agreed to keep [Pagonakis'] workplace accommodations in place at this time because I wanted to encourage [her] to remain part of our team." (JA 306) Klancic further states that she considered Pagonakis "an asset." (Id.)

Then, in late October or early November 2003, Pagonakis' accommodations came to the attention of Express' human resources department. Human resources advised Klancic that Pagonakis' accommodations could not continue unless proper medical documentation was submitted and the requisite approvals were obtained through Express' formal approval process. According to Pagonakis, her accommodations ceased in November 2003-- her schedule changed to include evening shifts and meetings, and she was assigned to work five to six days in a row. (JA 298) Klancic also testified that

Express eliminated special scheduling for all employees, including Pagonakis, at this time. Express denies that it ever stopped providing accommodations to Pagonakis.

Pagonakis states that at a November 25, 2003 meeting, Tara Kessler, Regional Human Resources Generalist for Express, explained that Klancic was not authorized to grant Pagonakis accommodations and that Pagonakis would need to submit medical documentation to human resources in order to reinstate the accommodations. Pagonakis asserts that she had presented doctors reports to Express in the past and that she tried to submit medical records to Kessler at the meeting, but Kessler refused to accept the documents. According to Pagonakis, Kessler directed her to contact the HR department within 24 hours to submit the paperwork.

According to Pagonakis, in December, 2003 she began to suffer from "extreme fatigue, exhaustion, and stress" because she was forced to work without her previous accommodations. (JA 299) She took her first FMLA leave from December 8 or 9 through December 22, 2003.

On December 23, 2003, Pagonakis' first day back from leave, her doctor submitted a one-page list of requested accommodations, but no documents regarding her disabilities or medical history. Pagonakis states in her declaration, "Defendant accepted this information and informed me that I had provided all necessary information." (JA 299)

Also upon her return from leave, Pagonakis asserts that she was subjected to a

hostile work environment as a result of taking leave. Specifically, she states that "my supervisors and co-workers treated me in a disparaging manner, including by making rude comments to me . . . [and] frequently criticizing me for taking FMLA leave and humiliated me by overriding my directions to subordinate employees." (JA 299) Pagonakis asserts that this treatment, and Express' continuing failure to provide her with the previous accommodations, forced her to take a second period of FMLA leave on February 3, 2004.

Pagonakis never returned to work. She resigned on March 18, 2004. Pagonakis states in her certification, "[a]s of [my resignation date] Defendant still had not located my personnel file, still had not contacted my physician to discuss my medical conditions and potential accommodations, still had not communicated with me about my request for workplace accommodations, and still had not made efforts to reasonably accommodate my disabilities." (JA 300)

Pagonakis filed the instant complaint against Express asserting three claims: discrimination under the ADA; retaliation under the ADA; and retaliation under the FMLA. Express moved for summary judgment, attacking all three claims on the merits. The District Court granted the motion in its entirety. *See Pagonakis v. Express, LLC,* 534 F. Supp. 2d 453 (D. Del. 2008).

The District Court held that Pagonakis could not establish a *prima facie* case of discrimination under the ADA, because no reasonable factfinder could conclude that

Pagonakis could perform the essential functions of the Co-Manager position with reasonable accommodations. *Pagonakis,* 543 F. Supp. 2d at 460-63.

The District Court also held that Pagonakis failed to establish a *prima facie* case of discrimination under the ADA because neither Express' asserted failure to accommodate, nor Pagonakis' constructive discharge were actionable adverse employment actions. *Pagonakis,* 543 F. Supp. 2d at 464. With respect to Express' failure to accommodate, relying on its previous essential functions analysis, the District Court concluded that there were no reasonable accommodations that would allow Pagonakis to adequately perform the Co-Manager position. *Id.* at n.14. As to the constructive discharge allegations, the District Court concluded that no reasonable jury could find the off-hand rude comments and other actions of Pagonakis' supervisors and co-workers sufficiently severe or pervasive to constitute a hostile work environment justifying her resignation. *Id.* at 464.

As to the two retaliation claims under the ADA and FMLA, the District Court relied on its previous analysis that no reasonable juror could find an adverse employment action. *Pagonakis,* 534 F.Supp.2d at 465.

This appeal followed.[2]

---

[2] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291. We apply a plenary standard of review. *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).

II.

A.

"A disabled employee may establish a *prima facie* case under the ADA if she shows that she can perform the essential function[s] of the job with reasonable accommodation and that the employer refused to make such an accommodation." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 610 (3d Cir. 2006). Pagonakis "must establish that she (1) has a 'disability,'(2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Id.* at 611. As noted previously, the issue of Pagonakis' disability is not before the Court.

A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m). The parties do not dispute the first prong of the inquiry.

"Whether a particular function is essential is a factual determination that must be made on a case by case basis based upon all relevant evidence." *Turner*, 440 F.3d at 612 (internal citation, quotation, and alterations omitted). A duty is an "essential function" of

the job if it is "fundamental," and not "marginal," to the employment position. 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential for any of several reasons, including, but not limited to, the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Turner*, 440 F.3d at 612 (citing 29 C.F.R. § 1630.2(n)(2)). Evidence of whether a particular function is essential might include, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2 (n)(3).

Because there are disputed issues of material fact as to the essential functions of

the Co-Manager position, we cannot agree with the District Court's conclusion that no reasonable jury could find that Pagonakis was a qualified individual. As a general matter, Pagonakis was promoted to Co-Manager by Klancic– the very person who granted Pagonakis her accommodations in the first place. Drawing a reasonable inference in favor of Pagonakis, a jury could find that Klancic would not have promoted Pagonakis to Co-Manager if her accommodations (which were in place at the time of her promotion) were inherently incompatible with the essential functions of the position.

Moreover, while Express asserts that opening and closing the store is an essential function of the Co-Manager position, the record evidence suggests otherwise. First, according to Express' own witness, Human Resources Manager Jennifer Hinkle, there is always a Manager, in addition to at least one Co-Manager on duty, and that Manager (or the second Co-Manager, if there was one on duty) would be able to open and close the store. Indeed, Klancic testified to this very fact:

> Q: And [other Co-Managers would] have to close when Ms. Pagonakis couldn't close?
>
> A: But there was always more than one manager working so there wasn't [sic] any additional people needed to come in.

(JA 210-11) *Cf.* 29 C.F.R. § 1630.2 (n)(3)(iv) (evidence of whether a function is essential includes "[t]he consequences of not requiring the incumbent to perform the function.").

Second, Klancic testified that there were "a lot" of co-managers (JA 336[3]), suggesting that the pool of people who could open or close the store was not dramatically limited by Pagonakis' elimination from the pool. *Cf. Turner*, 440 F.3d at 612 ("The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed.").

Third, Pagonakis asserts that she never was given keys to the store or trained to be a key holder. A reasonable factfinder might infer that she was not given training or keys to the store because she did not need training or keys– i.e., someone else could open and close the store.

Similarly, issues of disputed fact exist as to whether working in the store 40 hours a week (as opposed to working from home some hours) is an essential function, as Express asserts. First, as noted before, a reasonable factfinder might infer that Klancic would not have promoted Pagonakis if working 40 hours in the store was an essential function of the Co-Manager. Second, Jennifer Hinkle states that she needed to budget additional coverage for the morning and evening hours when Pagonakis could not be at the store, but she does not explain why extra coverage was needed, or what duties (other than opening and closing the store) must be performed during the mornings or evenings, as opposed to other times of the day. Third, Klancic identified work tasks that Pagonakis performed from home (such as drafting the district newsletter and checking employee

---

[3] "Q: There were a lot of co-managers, weren't there? A: Yes. Q: A good number of them? A: Yes." (JA 336)

references), which a reasonable jury could find undermines Express' contention that it was paying Pagonakis a salary based on 40 hours of work but Pagonakis' accommodations precluded her from working 40 hours a week.

Thus, factual disputes as to the essential functions of the Co-Manager position preclude a holding that no reasonable jury could find that Pagonakis was a qualified individual under the ADA. The District Court erred in holding otherwise.

Factual disputes also exist as to whether Pagonakis suffered an adverse employment action; namely, Express' asserted failure to reasonably accommodate her disability.[4] Pagonakis and Klancic testified that in November 2003 Express ceased accommodating Pagonakis, but Express denies that it ever stopped accommodating her. Express' Human Resources manager states that "Express ultimately determined that it *would* provide the requested accommodations because [Pagonakis] had been accommodated in this manner for several years." (JA 79) (emphasis added).

For the reasons stated above, Pagonakis has raised genuine issues of disputed fact as to her *prima facie* case of discrimination under the ADA. Accordingly, the District Court's grant of summary judgment on this claim will be reversed.

---

[4] Pagonakis also asserts that she was constructively discharged. We agree with the District Court that the alleged hostile work environment which she asserts forced her to resign was not sufficiently severe or pervasive to constitute an adverse employment action. *See Pagonakis,* 534 F. Supp. 2d at 464. However, for the reasons discussed herein, her ADA discrimination claim may nonetheless proceed on her failure to accommodate theory. To the extent Pagonakis asserts that Express' alleged failure to accommodate, rather than a hostile work environment, resulted in her constructive discharge, she may present that theory to a jury.

B.

Pagonakis also asserts that Express' alleged discontinuance of her accommodations was in retaliation for her taking FMLA leave.[5] The District Court properly granted summary judgment to Express on this claim[6] because no reasonable jury could find that Pagonakis' accommodations stopped as a result of her taking FMLA leave. *See Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir. 2004) (to establish a *prima facie* case of retaliation under the FMLA, a plaintiff "must show that (1) [s]he took an FMLA leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse decision was causally related to [her] leave."). It is undisputed that Pagonakis took both of her FMLA leaves *after* Express allegedly stopped accommodating her. Indeed, Pagonakis asserts that the alleged failure to accommodate her disabilities caused her to take medical leave. Logically, Express could not have retaliated on ths basis of events that had yet to occur. Accordingly, we will affirm the judgment for Express on the FMLA retaliation claim.

C.

---

[5] To the extent Pagonakis asserts that her asserted constructive discharge was in retaliation for taking FMLA leave, we have already held that the alleged harassment Pagonakis suffered was not sufficiently severe or pervasive to be actionable. *See supra* note 4.

[6] Pagonakis' brief in support of this appeal asserts that Pagonakis suffered direct discrimination under the FMLA in addition to retaliation. However, the Complaint clearly asserts only an FMLA retaliation claim and not an FMLA discrimination claim.

13

Lastly, we will also affirm the judgment for Express on the ADA retaliation claim. As already articulated, Pagonakis' hostile work environment / constructive discharge claim fails. While we have held that disputed issues of fact preclude summary judgment on her failure to accommodate theory, such a claim cannot be characterized as a retaliation claim under the ADA. The claim is a direct discrimination claim based on alleged failures to fulfill the affirmative duties prescribed by the ADA, *see generally US Airways, Inc. v. Barnett,* 535 U.S. 391, 396 (2002) ("the ADA says that 'discrimination' includes an employer's 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee . . .'") (quoting 42 U.S.C. § 12112(b)(5)(A); emphasis omitted); not a claim based on alleged actions prohibited by the ADA, *see* 42 U.S.C. 12203(a) (prohibition against retaliation).

III.

For the reasons set forth above, the District Court's judgment for Express on the failure to accommodate ADA discrimination claim will be reversed and the case remanded for further proceedings consistent with this opinion. The judgment of the District Court will be affirmed in all other respects.